CENTRAL TRUST Co. and another *v.* WABASH, ST. L. & P. RY. Co. and others.  (UNITED STATES TRUST Co. and others, Intervenors.)[1]

*(Circuit Court, E. D. Missouri.  December 9, 1885.)*

MORTGAGES, GENERAL AND UNDERLYING—FORECLOSURE—RECEIVERS—POSSESSION OF PROPERTY.

   Application by trustees in an underlying mortgage to have property covered by their mortgage turned over to receivers appointed in suit to foreclose said mortgage, denied for the present, in view of negotiations for sale of entire system under the general mortgage thereon.

In Equity.

The intervenors' petition states that, pursuant to leave granted by this court, the intervenors have instituted proceedings in the circuit court of Gentry county, Missouri, and of Pottawattamie county, Iowa, to foreclose a mortgage executed to them by the St. Louis, Kansas City & Nebraska Railway Company, known as the "Omaha Division First Mortgage;" that the past-due interest on bonds secured by said mortgage amounts to $82,250; that the appointment of receivers in said foreclosure proceedings has been applied for; and that the petitioners, and the bondholders whom they represent, desire that all

[1] Reported by Benj. F. Rex, Esq., of the St. Louis bar.

the property described in said mortgage, and which is now in the hands of the Wabash receivers, may be transferred to the receivers appointed, or to be appointed, in said foreclosure suits.   Wherefore the petitioners pray that the Wabash receivers be ordered by the court to make such transfer.   See 22 Fed. Rep. 272; 25 Fed. Rep. 69.

*A. W. Stewart* and *Theodore Sheldon,* for intervenors.

*Wells H. Blodgett,* for receivers.

*Phillips & Stewart,* for complainant.

*Greene, Burnett & Humphrey* and *Henry T. Kent,* for defendants.

BREWER, J., *(orally.)*  In the matter of the petition of the United States Trust Company of New York, mortgagee of the Omaha Division, the petitioner asks this court to make the same order, substantially, that was made one year ago in reference to the surrender of certain branch roads.or divisions.   The order then,was to surrender such divisions upon applications from and to the trustees in the divisional mortgages.   We think no order of that kind should be made just now.   Not that the application should be denied; but, simply, that the matter will be continued for further action, and for these reasons:

In order to present the matter, it may be well to go back to the time of the inception of this foreclosure proceeding.   When this court, in the first instance, was asked to take charge of the Wabash road, one important consideration, which was presented, and which seemed to justify the action that was taken, was that here were a multitude of roads, which, by consolidation, purchase, and lease, had been thrown into one vast system, almost transcontinental.   Upon this combined system a general mortgage had been placed.   There were also upon the various divisions, or upon many of them, at least, underlying prior mortgages.   The security which the holders of the bonds under this general mortgage had was not merely the residuum of value in each division after the payment of the mortgage lien upon it, but that measure of value which flowed from the·preservation of the system and the maintenance of long trunk lines; and, in order to prevent that.disintegration which would inevitably follow upon default in the leases and divisional mortgages, the court took possession of the property, and endeavored to preserve it as a unit.   The case ran along for a year or so in that situation.   It was not thought at that time that the legal rights of a lessor could be cut off, or that, if his rental was not paid, he had no remedy,—no right to recover his property. It was not thought that the mere possession of a court of equity destroyed the legal rights of the lessors or subdivisional mortgagees, and so the court last spring made an order in behalf of several trustees who came in that the roads and divisions and franchises on which they held their prior separate mortgage, should be turned over to them, the rental not being paid,—the interest on the mortgages not being paid.   It was at the instance, in all cases, of course, of the trustees in the mortgages, or of the lessors.   As was stated by the court

at that time, it did not, of itself, propose to disintegrate this system, but it did not propose to deny to any lessor or subdivisional mortgagee the rights which such mortgagee or lessor had. Well, since that time the holders of these general mortgage bonds, and the Mercantile Trust Company bonds, have arranged for a foreclosure and sale of the whole property, substantially. It is true that the arrangement has not been finally consummated by a decree; but it is represented to us that the holders of all the bonds secured by the Mercantile Trust Company mortgage, and of thirteen out of seventeen millions of those secured by the Central Trust Company mortgage, have signed an agreement therefor, and the parties are hurrying, as rapidly as they can, to the preparation of a decree, and the filing of a final report of the master in order that that decree may be signed.

Now, under these circumstances, the question comes fairly to the court whether we are not justified in stopping, if I may so express it, the further disintegration of this system. There are more interests involved in this property than the interests of the subdivisional mortgagees. Take this Omaha Division, for instance; the stockholders are interested in this matter as well as the bondholders. The stockholders, through their representative, the corporation, leased to the Wabash road that line. They relied upon the rentals to pay the interest on these bonds, and prevent default. They expected, and had a right to expect, that, as that was continued and attended to, the interest being paid, that their property—the value of their interest as stockholders—would steadily increase. Well, the rentals not being paid, default was made in the coupons. The stockholders could not, or would not, put their hands in their pockets and pay the interest on those bonds. Legally, as between the two, the bondholders have a right to insist that that mortgage be foreclosed and the property sold; but, at the same time, the stockholders have an interest in there which has been apparently prejudiced, if not lost, by the default of the Wabash road in failing to pay its rentals, and if, in any way, the court can so manage this entire property, and so effectuate a sale that these defaulted rentals can be paid, and thus secure the payment of the coupons and the interest, it will work to the preservation of the rights of these stockholders, and of the bondholders also. And then, beyond that, as I stated at the outset, the bondholders in this general mortgage did not look alone to these 15, 20, or 30 separate divisions to consider what would be the residuum of value after the mortgage on each separate division was foreclosed and the property sold. They had regard to the fact that, by a combination in one trunk system, a greater value was given than the aggregate of the separate values of these various divisions. It is true that those who were the promoters of this vast scheme failed in it; but the persons who took those bonds, many of them, doubtless, were ignorant of the situation. They bought on the faith of the success of this scheme; and while, as a matter of strict legal right, they have no ground of

complaint if the scheme fails, yet, if the court can in any way, by a reasonable exercise of its power, preserve that system, and promote its sale as a unit, it certainly ought to do it, so as to give to them whatever measure of value their bonds have therefrom. Tear this system to pieces, as I said a year ago, and there would not be, probably, any material value .to the bonds secured by this general mortgage. It seems to us, therefore, that it is fair to say to those gentlemen who come now as trustees, and otherwise, asking to take out this and that division, that the matter is in such shape that we are justified in saying to you "You must wait, and if this scheme fails, why the same orders will be entered as have been made heretofore." If this scheme succeeds, and the sale is made, the rentals will all, probably, be paid. The rentals being paid, your coupons will be paid; the stockholders of these divisions will be protected in their rights, and no party will suffer material wrong.

Now, this is the conclusion to which we have come at present. Of course, you all can see it is not an easy thing, it is not free from embarrassments and vexations, in the management of a property which is so vast in itself, and where there are so many conflicting interests, to so rule as will preserve the equality of rights between all. We think, however, that the safest way to do is to wait until that decree is presented; that is, providing it is presented within a short time. Then we pass upon that decree, and in that decree, and at the time of settling it, we can dispose of all of these questions at once, instead of taking them up one by one. Although, when separately considered, it would seem as though the parties presenting them had independent rights, yet, we think, there is danger, if we act on them separately, that we shall make some orders which, when we come to the final decree and adjustment between all these parties, will prove to have been imprudent. The delay asked for is but brief. We think that it is no more than right to all the parties in interest that these applications should be continued.

So I may add, specially in reference to the application for approval of the appointment of Mr. Thatcher as receiver, I do not apprehend there would be any danger of a receiver appointed ever attempting to enforce any unjust contract upon the Wabash road, or attempting any harsh use of his power. Indeed, I know he could not, because his action would be subject to the control of Judge Love, and no better man lives than he for the management of affairs of that kind; and yet, I think, my Brother Love, if he were in our place to-day, would say that we do well for the present to withhold approval of his action, leaving things in *statu quo*. Of course, this may be but temporary. For the present, then, these matters are continued for further action.

Brother Treat suggested before coming into the court-room, and calls my attention now to the fact, that our past experience with one or two of these roads has been along the line of the wisdom of the present action, in that, after the trustees had come and had their

roads turned over to them, they came back and asked us to run the roads for them; so that all the action we now take is to say that this matter will be continued for the present.